## Case No. 5,645.

### The GOVERNOR.

[Abb. Adm. 108.] [1]

District Court, S. D. New York. Jan., 1848.

COLLISION—BURDEN OF PROOF—WEIGHT OF TESTIMONY.

1. Where two vessels are running in the same direction, the one astern of the other, there rests upon the rear vessel an obligation to exercise precaution against collision, which is not chargeable to the same extent upon the other.

[Cited in Whitridge v. Dill, 23 How. (64 U. S.) 454; The City of Merida, 24 Fed. 234; The City of Macon, 47 Fed. 924.]

2. A vessel of superior speed, running in the same direction with a slower one, has a right to pass her if she can do so with safety to both; but the burden of proof is upon her, in case of collision, to show the prudence of her own conduct, and also to prove negligence or misconduct on the part of her rival.

[Cited in Whitridge v. Dill, 23 How. (64 U. S.) 454; The Narragansett, Case No. 10,-016; Simpson v. Spreckels, 13 Fed. 94; The City of Macon, 47 Fed. 924.]

3. A vessel in advance is not bound to give way, or to give facilities to enable a vessel in her rear to pass her, though she is bound to refrain from any manoeuvres calculated to embarrass the latter in an attempt to pass.

[Cited in The Commodore Jones, 25 Fed. 509; The St. Johns, 34 Fed. 766.]

4. In collision cases, the court will attach a greater weight to the testimony of witnesses to facts which occurred within their own knowledge, on board their own vessel, than to any opinions or judgments formed by those upon one vessel respecting the management of the other.

This was a libel in rem by John Van Pelt, owner of the steamboat Worcester, against the steamboat Governor, to recover damages

1 [Reported by Abbott Brothers.]

for a collision. The collision complained of occurred under the following circumstances: The steamboats Worcester and Governor were passenger vessels, which sailed tri-weekly from New York, on the same day and at the same hours. They left New York on the afternoon of March 2, 1847, about simultaneously, bound on the same course up the Sound for Boston. The Worcester belonged to the Norwich line of steamboats, the Governor to the Stonington line. As they passed through the East river and through Hell Gate, the Worcester was somewhat ahead, the Governor being most of the time in her wake, and occasionally lapped upon one quarter. The Governor was slightly the superior in speed, and was seeking, from time to time, between New York and Sands' Point, to avail herself of a favorable opportunity to pass her rival. The boats ran in company in this manner, from one to two lengths apart, until, when they reached the Stepping-Stones, three or four miles from Sands' Point, the Governor took a course parallel with that of the Worcester, and continued a length or two distant from her, each boat steering for Sands' Point buoy, and in such manner as to give it in passing the usual safe berth. They came in collision at that place—the larboard bow of the Governor striking the starboard quarter of the Worcester, near the gangway and just aft the boiler, and causing some little damage, the expense of repairing which amounted to $53.

The cause now came before the court upon the pleadings and proofs. There was some conflict of testimony upon the question which of the boats was responsible for the collision. Several witnesses, who were on board the Governor at the time, testified that that boat held her course steadily, edging as close to the shore as could be done with safety, and in such manner that she brought the buoy at Sands' Point against her starboard guards and under them; and that the Worcester, as it appeared to the witnesses, deviated from her true course, bearing towards the Governor, until, when within a quarter of a mile from the buoy, she sheered directly across the bows of the latter boat, thus causing the collision. The two pilots on board the Worcester, on the contrary, both swore that that boat was running by the compass N. E. ¼ E., from the time of passing the Stepping-Stones up to the moment of collision; that she was not sheered from that course towards the Governor; that the course of the Worcester was the course usually taken by steamboats on the Sound to pass Sands' Point, being calculated to secure a safe berth from the buoy; and that the usage of navigation was to run near Sands' Point in going into the Sound. In these general statements as to the course of navigation, all of the witnesses on both sides, who were acquainted with the subject, concurred.

Luther R. Marsh, for libellants.
John Sherwood and S. Sherwood, for respondents.

BETTS, District Judge. If the Worcester and the Governor had been running in opposite directions, the collision might, probably, have been deemed to be so far the result of mere casualty and misadventure as to leave each vessel to bear for herself the consequences of the accident falling upon her.[2] But the fact that they were running in the same direction, the one astern of the other, imposed upon the rear boat an obligation to precaution and care which is not chargeable to the same extent upon the other. In the light of this principle, the circumstances of the present case manifestly cast the burden of proof upon the Governor. She was astern, and was seeking to run past the Worcester. She had a right to the advantage of her superior speed, and under such circumstances it would have been tortious and blameable conduct on the part of the Worcester designedly to intercept the Governor, to crowd her off, or to baffle her in that effort.[3] But it devolves upon the Governor to show the prudence of her own conduct, as well as to prove negligence or misconduct on the part of the Worcester. It was not the duty of the latter boat to veer from her course so as to open a passage for the Governor, or to lend her any facility in aid of her purpose to pass. We may censure any rigid adherence to strict right by which one competing boat interposes embarrassments in the way of her competitor, and may regret the want of a magnanimous and liberal course of conduct which might relieve a vessel of superior speed and endeavoring to get ahead, from delay or difficulty in accomplishing that object. But the court is only empowered to adjudicate the legal rights of the one and the responsibility of the other.

It was therefore clearly the duty of the Governor to select a place for passing the Worcester, and a mode of effecting it, which would not expose the latter to injury. The rear boat, in such case, must stop her way, or back off and await the opening of a sufficient passage, if the leading boat is so placed that safe room is not left to pass without coming within a hazardous proximity to her. The general law of navigation secures to vessels under way the track they are rightfully pursuing, and makes it cause of damage for others to molest or crowd upon them in it. Jac. Sea Laws, 338. This subject is often regulated by municipal laws in respect to vessels within the jurisdiction of the particular government; and if such laws are not of positive obligation in mari-

---

[2] See The Moxey [Case No. 9,894], where the authorities upon this point are mentioned.

[3] Compare the case of The Rhode Island [Id. 11,745], where the relative rights and duties of two steamboats, bound in the same direction, the one in advance of the other, are discussed.

time courts, they are frequently adopted as rules of decision in respect to collisions on the waters of the state, or by vessels owned within it.[4] The defence has accordingly been placed upon the ground that the Governor was on a course which afforded ample room for both boats to pass the buoy and Sands' Point without interfering, and that the Worcester, by design or through carelessness, veered from her proper track, and bore across that of the Governor. This fact is the turning point in the case, and vital to the defence.

Several witnesses, who were on board the Governor at the time of the collision, give their opinion in decided terms that such was the fact. The master of the Governor, her pilot, and several passengers on board, concur in stating that the Worcester suddenly bore off her course to the starboard, when the Governor was a quarter of a mile in her rear, and that she crowded in upon Sands' Point so much that the Governor, if she continued moving, must either strike her or go upon the rock.

It appears to me this evidence fails to establish a justification of her conduct, for two reasons:—

First.—It is not shown that the engine of the Governor was stopped, or slowed, as soon as there appeared to be danger that the two boats might come together, nor that the full means in her power were employed in due season to avoid coming upon the Worcester; for the master of the Governor, in his testimony, admits he could have avoided striking the Worcester, if, at the time when he first noticed that she was altering her course, he had supposed that she would crowd in so closely upon his track.

Second.—The evidence charging the fault upon the Worcester is essentially matter of opinion, and not statements of facts. The witnesses say that the Worcester appeared to them to bear down upon and to cross the Governor's line of approach. These witnesses were upon the Governor, and their judgment as to the direction of the other vessel was guided by nothing more than the apparent approximation of the two, and the impression that the converging was caused by a wrong movement of the Worcester. Their position was most unfavorable to an exact and accurate judgment on that point. No range was taken to any fixed object, nor was the course or bearing of either boat observed by the compass. They were themselves advancing with great speed, and were looking at an object several hundred yards distant, moving from them with velocity. Very slight reliance can be placed in the opinions of witnesses so circumstanced, as to the actual bearing and course the Worcester was pursuing at the time. These impressions and opinions of the witnesses must be weighed as part of the evidence in the case, particularly so far as they may avail in corroboration of facts proved, or to countervail testimony of like character from the other party; but alone they would scarcely justify a judgment in conformity to them. They are, however, met by the testimony of the two pilots on board the Worcester, both of whom deny that there was any deviation or alteration in her course, such as was stated to have taken place by the witnesses on the Governor, and who say that her course was the one usually taken by steamboats on the Sound in passing the point.

In collision cases, the court always discriminates carefully between the testimony of witnesses to facts which they assert to have occurred upon their own vessel and within their own knowledge, and the opinions and beliefs expressed by them in respect to what occurred upon the adverse vessel. Where the witnesses are credible, their direct testimony to what was done or omitted by themselves or by others under their immediate and direct observation, is far more satisfactory and decisive than any opinions or inferences formed in respect to matters lying without their positive knowledge, especially where those matters relate to the management of another vessel. However intelligent and upright the witnesses may be, there must always be great difficulty in judging accurately in respect to the manner in which a distant vessel is navigated; and the natural difficulties in the way of forming a sound judgment in respect to the management of such vessels are greatly enhanced in the case of collision, by the excitements of the occasion, and by the many circumstances which go to give a bias or prejudice to the mind. Thus it is observed that persons on board each vessel almost invariably attribute the collision and fault of the occurrence to the opposite one. The testimony of witnesses to their knowledge of what occurred upon their own ship accordingly justly outweighs that of superior numbers who speak only from a judgment or opinion, formed from distant observation.[5]

In this view of the case, I regard it as proved, by a preponderance of testimony, that the Worcester held her regular and proper course without deviation. That course, having an inclination towards the buoy, brought her nearer to it, and with greater rapidity than was anticipated or supposed by those on board the Governor.

---

[4] A statute of the state of New York prescribes that "whenever any steamboat shall be going in the same direction with another steamboat ahead of it, it shall not be lawful to navigate the first mentioned boat so as to approach or pass the other boat so being ahead, within the distance of twenty yards; and it shall not be lawful so to navigate the steamboat so being ahead, as unnecessarily to bring it within twenty yards of the steamboat following it." 1 Rev. St. 682, § 7. Penalty, $250. Id. 683, § 8.

[5] See, also, remarks of the court upon this subject in The Narragansett [Case No. 10,019]; The Argus [Id. 521]; The Rhode Island [Id. 11,745].

The latter boat was accordingly kept on a line of direction as if under the persuasion that the Worcester must continue at about the same distance from the buoy in running out her course as she was from the Governor. The master of the Governor, however, was evidently aware that the boats were approximating each other, and enough was brought to his notice to have put him upon his guard and to call for the exercise of great caution. He says that he could have avoided the Worcester when he first saw her alter her course near the place of collision, but he had no idea that she would "jam in so close." As soon as he became aware of it, he shut off the steam and stopped his boat. It was then too late, however, as the boats were already almost in the act of striking. Upon these facts, the Governor is chargeable with blame, and must be liable for the consequences.

The damages were fortunately very slight. The bill of repairs presented, the payment of which only is claimed, amounted to no more than $53. The payment of that sum would have avoided this controversy; and, as the Worcester demanded no more than her actual disbursements, to which she was clearly entitled, the claimant must be charged with the costs arising from the contestation of that claim. Decree for the libellant for $53, with interest at six per cent. from March 10, 1847, together with costs to be taxed.